UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

TONY JONES,                                :

                    Petitioner,     :          **OPINION**

          - against -              :          03 Civ. 3312 (DC)

JAMES CONWAY, Acting Superintendent:
of Attica Correctional Facility,
                                  :
                    Respondent.     :
- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**     TONY JONES
                Petitioner <u>Pro</u> <u>Se</u>
                Attica Correctional Facility
                Box 149
                Attica, New York  14011

                ELLIOT SPITZER, ESQ.
                Attorney General of the State of New York
                Attorney for Respondent
                     By:  Luke Martland, Esq.
                          Michael P. King, Esq.
                          Assistant Attorneys General
                120 Broadway
                New York, New York  10271

**CHIN, D.J.**

          <u>Pro</u> <u>se</u> petitioner Tony Jones brings this petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner

was convicted on December 16, 1998, of one count of Burglary in

the Second Degree (New York Penal Law ("P.L.") § 140.25(2)), two

counts of Criminal Possession of Stolen Property in the Fifth

Degree (P.L. § 165.40), one count of Criminal Trespass in the

Second Degree (P.L. § 140.15), and one count of Criminal

Possession of a Controlled Substance in the Seventh Degree (P.L.

§220.03).  Petitioner was sentenced as a persistent violent

felony offender to an indeterminate prison term of sixteen years

to life on the burglary count and concurrent sentences of one year on each of the four remaining counts.

Petitioner challenges his state-court conviction on the following grounds: (1) ineffective assistance of counsel, (2) improper withholding of discovery related to fingerprint evidence, (3) the trial court's refusal to grant a three-hour adjournment, which he contends violated his rights under the Sixth and Fourteenth Amendments, and (4) improper admission of non-probative and prejudicial evidence in the form of uncharged crimes testimony.  For the reasons that follow, the petition is denied.

## BACKGROUND

### I.   The Facts

This case arises from three break-ins that occurred over a two-and-a-half week period in March and April 1998.  The following is a summary of the facts adduced at trial.

#### A.   Burglary at 605 West 112th Street

In March 1998, Jennifer Baldwin resided in a duplex apartment located on the first floor and basement level of 605 West 112th Street with her roommates Emily Gunzburger and Moira Meenagham.  (Tr. 369).[1]  Gunzburger's boyfriend, Darren Irving, and Meenagham's boyfriend, Erick Bakko, also frequented the apartment.  (Tr. 397, 412-13).  The kitchen, living room, bathroom, and Gunzburger's bedroom were on the apartment's main

---

[1]    References to "Tr." are to pages of the trial transcript.

floor.  (Tr. 369, 397).  From the main floor, a spiral staircase led to the apartment's lower level where the bedrooms were located.  (Tr. 369).  To access Baldwin's bedroom from the apartment's interior, one had to walk through Meenagham's bedroom.  (Tr. 413).  Baldwin's bedroom also had a door leading into the building's basement, through which Baldwin occasionally would enter and exit her apartment.  (Tr. 369, 373).

In the early morning hours of March 18, 1998, Meenagham heard a sound from Baldwin's bedroom.  (Tr. 414).  Bakko investigated, but did not see anything, except that Baldwin had not yet returned home.  (Tr. 414).  Later, at about 3:15 a.m., the phone rang.  (Tr. 398, 415).  When no one answered, the caller left the following message:

> Yes, this is a message for Jennifer Baldwin.
> Your whole life is scattered across Central
> Park . . . [I] found your wallet, driver's
> license, photos, other ID's, and contents of
> a wallet somewhere in the northwest corner of
> Central Park around a subway station.

(Tr. 398-99, 415).

The phone rang again about ten minutes later.  (Tr. 400, 415).  This time Irving answered the phone.  (Tr. 400, 415).  The person on the other end identified himself as "Tony," a homeless man living in Central Park.  (Tr. 400).  Tony stated that he had found the contents of Baldwin's wallet, which he wanted to return because officers might search him, find the wallet, and suspect that he had taken it.  (Tr. 400-01).  Irving agreed to meet Tony.  (Tr. 402).  Five minutes later, Tony telephoned the apartment a third time.  (Tr. 403).  Irving

answered the phone, and Tony stated, "I'm waiting for you. Hurry up because I want to get the stuff off of me so I don't have any problems." (Tr. 403). Testimony at trial established that the calls were placed from a payphone on Central Park West using Baldwin's MCI phone card. (Tr. 440-41; Ex. B at 10).[2]

Before leaving, Irving and Gunzburger entered Baldwin's room and noticed that the door leading from Baldwin's bedroom to the basement hallway was ajar. (Tr. 403). Gunzburger also observed that Baldwin's radio and jewelry were missing. (Tr. 404).

Bakko accompanied Irving to the arranged location, where they waited for the caller. (Tr. 404, 416). A man approached, introduced himself as "Tony," and showed them Baldwin's wallet. (Tr. 404, 416). Tony assured the two men that he had not taken any of its contents. (Tr. 404, 416-17). Additionally, Tony told them that he had used Baldwin's MCI Phone card to call the apartment because he did not have any money on him. (Tr. 404). Tony then handed the wallet to Irving in exchange for ten dollars. (Tr. 404). Tony also handed several pieces of mismatched jewelry to the men, stating that it was dark outside and the poor lighting prevented him from finding more. (Tr. 406). Irving and Bakko took the jewelry but did not give any more money to the man. (Tr. 406, 417).

Meanwhile, Gunzburger and Meenagham called the police. (Tr. 406, 418). Upon Irving and Bakko's return, the group met

---

[2]    References to "Ex." are to exhibits attached to Respondent's Declaration in Opposition.

with police officers and recounted the night's events. (Tr. 406, 418).

When Baldwin returned to her apartment in the morning, she met with her roommates and their boyfriends, and then contacted the police. (Tr. 377-79). Baldwin examined the wallet that Tony had returned and confirmed that nothing was missing. (Tr. 394-95). Baldwin also inspected her room and discovered that approximately fifteen pairs of earrings and her portable compact disc player were gone. (Tr. 377-78). Police officers from the 26th Precinct returned to the apartment around 8:30 a.m. to meet with Baldwin. (Tr. 379).

At approximately 9:30 a.m., Tony telephoned the apartment for the fourth time, again using the calling card, and spoke with Baldwin. (Tr. 379, 390-91; Ex. B at 10). Tony stated that he had found more of Baldwin's jewelry and wanted to return it in exchange for a reward. (Tr. 379-80).

Baldwin and Tony arranged to meet. (Tr. 380, 392). Gunzburger agreed to accompany Baldwin to the meeting. (Tr. 380-81). After the two women waited several minutes at the arranged location, Tony approached Baldwin and removed a brown pouch from his pocket, which contained Baldwin's jewelry. (Tr. 382). Baldwin gave ten dollars to Tony, and he left. (Tr. 382). Baldwin returned to her apartment, inventoried the bag's contents, and found that it contained all of her missing jewelry. (Tr. 382-83).

**B.   The Unauthorized Use of Baldwin's MCI Calling Card**

On March 20, 1998, Officer John Castellano interviewed Baldwin.  (Tr. 445, 454-55).  During the interview, Baldwin notified Castellano of unusual activity on her MCI calling card. (Tr. 445-46, 454-55).  Specifically, on March 18 and 19, 1998, someone had used Baldwin's MCI calling card number to place twenty-nine unauthorized calls from New York City pay phones and private residences.  (Tr. 388-89, 440-41).  Baldwin's MCI phone bill revealed that thirteen of those unauthorized calls had been made to a business called "Actors and Advertising," and two of the calls had been made to an individual named Joanna Marc who lived on Senator Street in Brooklyn.  (Tr. 440-41; Ex. B at 10). David Palmer, a representative of Actors & Advertising, testified that Marc was the company's receptionist and resided on Senator Street.  (Tr. 365-66).  Palmer also recognized petitioner as an individual who had visited Marc at the office.  (Tr. 365).

**C.   Criminal Trespass at 423 West 118th West Street**

At 10:07 a.m. on March 30, 1998, a surveillance camera captured an individual entering a Columbia University-owned apartment building located at 423 West 118th Street through the basement door.  (Tr. 330-33, Ex. B at 11).  A few moments later, Peg O'Sullivan, the building's superintendent, interrupted the intruder.  (Tr. 339, 341, 343-44).  O'Sullivan screamed and demanded that he leave the building.  (Tr. 341, 343-44).  The intruder exited the building through the basement door.  (Tr.

341-42). O'Sullivan ran to the building's courtyard and alerted Columbia University officials of the trespass. (Tr. 342).

Shortly thereafter, Dennis O'Sullivan, a Columbia University manager, received the report of the break-in and proceeded to West 118th Street. (Tr. 336).[3] On his way to the apartment building, Dennis O'Sullivan observed a man known to him as "Tony Jones" two blocks from 423 West 118th Street. (Tr. 336-37, 448). Dennis O'Sullivan met with Peg O'Sullivan and reviewed the surveillance videotape. (Tr. 333, 335). He recognized the individual on the videotape to be the same man -- "Tony Jones" -- he had passed on his way to the building. (Tr. 336). At trial, Dennis O'Sullivan identified petitioner as the individual he had seen on the street and on the videotape. (Tr. 335-36).

Dennis O'Sullivan then went to the 26th Precinct, where he met with Officer Castellano. (Tr. 335-36, 446-47). Dennis O'Sullivan viewed the videotape with Castellano and informed Castellano that the intruder's name was "Tony Jones." (Tr. 335-36, 447-48).

After Castellano learned from O'Sullivan that the intruder in his building had the same first name as the man who had ransomed Baldwin's stolen property in the same neighborhood less than two weeks earlier, he arranged for Baldwin, Irving, and Bakko to view a line-up consisting of petitioner and five fillers (Tr. 389-90, 406-07, 419, 448-50). Both Baldwin and Bakko identified petitioner as "Tony," the man who had ransomed

_____

[3]     Dennis O'Sullivan is not related to Peg O'Sullivan.

-7-

Baldwin's stolen property on March 18, 1998.  (Tr. 390, 419).

Irving was unable to recognize anyone in the line-up.  (Tr. 407).

### D.   **Removal of Property at 309 West 99th Street**

On April 5, 1998, at about 3:40 p.m., David Gonzalez
and his adult son, John Gonzalez, encountered an individual on
the stairs leading from the basement of the building at 309 West
99th Street, where David Gonzales was the superintendent.  (Tr.
239-40, 250-51, 264-65).  The individual was moving boxes from
the stairs onto a wheeled chair.  (Tr. 250-51, 265-66).  John
Gonzalez recognized the boxes and chair as belonging to his
father.  (Tr. 250-51, 258-59, 265-66).

The Gonzalezes confronted the person.  (Tr. 252).  When
John Gonzalez stated that he was going to call the police, the
man abandoned the goods and fled towards Riverside Drive.  (Tr.
252-53, 266-67).  John Gonzalez then called the police and made a
report.  (Tr. 253).

At about 3:50 p.m., Officer Hugo German and his
partner, Officer Carlos Rivera, met with the Gonzalezes.  (Tr. 6,
271).  The Gonzalezes gave the officers a description of the
individual they had just encountered.  (Tr. 253-54, 260, 272).
John Gonzalez then accompanied the officers in their vehicle to
canvass the neighborhood.  (Tr. 253-54, 261).

Approximately one minute after transmitting the
Gonzalezes' description of the individual, Officer German
received a call from an officer stating that he was detaining
someone who matched the description.  (Tr. 272-73).  Officers

German and Rivera drove John Gonzalez to where the officer was detaining the individual. (Tr. 272-73). There, John Gonzalez viewed the individual and confirmed that he was the person who he had seen removing property from his father's building. (Tr. 254-55). The officers then brought David Gonzalez to that location, and he too confirmed that the individual who had been detained was the perpetrator. (Tr. 254, 261, 267-68, 274). Officer German arrested the perpetrator and in the process, recovered a crack pipe from the pocket of the individual's jacket. (Tr. 274). At trial, both John and David Gonzales identified petitioner as the man they had seen taking the property from the building. (Tr. 253, 267-68).

## II.  **Proceedings in the Trial Court**

Petitioner was indicted in 1998 by a New York County grand jury for three counts of Burglary in the Second Degree, two counts of Criminal Possession of Stolen Property in the Fifth Degree, and one count of Criminal Possession of a Controlled Substance in the Seventh Degree. Petitioner moved to suppress physical evidence and identification testimony, challenging the basis for recovery of the physical evidence and the purported coerciveness of the identifications. On November 19, 1998, following a hearing on the issue, Justice George Daniels denied petitioner's motion, ruling from the bench. After jury selection, trial commenced on December 10, 1998.

At trial, four main issues were presented that now form the basis of petitioner's claims: (1) the prosecution failed to

-9-

disclose possibly exculpatory discovery related to fingerprint evidence; (2) the trial court's denial of the defense's request for a three-hour adjournment to give defense counsel additional time to prepare petitioner to testify; (3) admission of evidence relating to the use of Baldwin's MCI phone card records; and (4) testimony about uncharged "prior incidents" or crimes from Sergeant Castellano.[4]  These matters are summarized as follows:

### A.  Fingerprint Evidence/Testimony

Castellano was assigned to the investigation of the burglary of Baldwin's apartment on March 19, 1998.  (Tr. 445, 454).  On March 20, he phoned Baldwin and arranged for her to look at photos and possibly do a search of the neighborhood, but took no further action until March 30th.  (Tr. 445-46, 454-455).  At "some point," however, fingerprints of Baldwin's apartment were taken.  (Tr. 383-84, 457).

During a sidebar conference, petitioner's counsel claimed that she had not been informed about any fingerprint investigation and objected to the prosecution's withholding this information, claiming it hindered her defense.  (Tr. 384).  The prosecution questioned the basis for counsel's objection, stating that the fingerprint results were inconclusive.  (Tr. 385).  The following day, petitioner's counsel cross-examined Castellano about the fingerprint investigation, effectively establishing that no fingerprint results were recovered.  (Tr. 457-58).

---

[4]   In the time between the criminal investigation and trial, Officer Castellano was promoted to Sergeant.  (Tr. 444).

**B.    Petitioner's Request for an Adjournment**

At the end of the People's case, the court asked whether petitioner was going to testify.  (Tr. 462).  It was 11:07 a.m.  (Tr. 465).  Counsel replied that petitioner was probably going to testify but requested an adjournment until 2:00 p.m. to consult with petitioner about this possibility and prepare petitioner to testify.  (Tr. 462-65).  Counsel promised that at 2:00 p.m. either petitioner would testify or she would be prepared to sum up.  (Tr. 465).  Counsel explained that she had not had sufficient time to talk to petitioner despite trying to talk with him for the last three days.  (Tr. 462-63).  She stated that petitioner was taken back to Riker's Island at 5:30 or 6:00 p.m. each evening, and she was not allowed to visit Riker's Island at night.  (Tr. 462).  Every morning petitioner's counsel and co-counsel had arrived at the court early based on the advice of corrections that sometimes the clients are produced at 8 or 8:30 in the morning.  (Tr. 462).  Petitioner, however, was never brought in early.  (Tr. 462).  Counsel even claimed to have skipped lunches in an effort to discuss fully this decision with petitioner.  (Tr. 463).

The court denied the request for an adjournment until 2:00 p.m., allowing instead a break of thirty minutes so that counsel could quickly confer with her client.  (Tr. 465).  Counsel protested that it was going to take at least ten or fifteen minutes to bring petitioner up and they would have only fifteen minutes to talk.  (Tr. 465).

The court explained that since the case had been assigned to counsel in April (eight months earlier) and the trial had already been going on for a week, it was not reasonable for counsel at this late stage to make the application for an adjournment based on lack of time to confer with her client. (Tr. 464-65). The court stated, "I think it's fairly reasonable for me to give you a half hour to figure out if he is going to testify, and get him ready to testify, if you have not taken the opportunity since up until this point." (Tr. 466). Counsel protested, saying, "Judge, that's unfair. We have taken the opportunity. That's not the issue." (Tr. 466). Ignoring counsel's protests, the court moved on, stating, "We have got this jury waiting. We have like three hours of testimony over a week's period. I have given plenty of time to this case. As a matter of fact, we adjourned early every day . . . . Don't tell me you didn't have an opportunity to speak with your client." (Tr. 466-67). The court held firm to its ruling of a thirty-minute adjournment, and informed counsel that any further protest was simply wasting her thirty minutes. (Tr. 467).

**C.** **The MCI Phone Card**

Prior to opening statements, defense counsel sought to preclude testimony regarding petitioner's unauthorized use of Baldwin's MCI calling card, arguing that the use of the card was an uncharged crime and therefore not admissible as evidence. (Tr. 184-85). The court acknowledged that evidence of use of the phone card was indeed evidence of an uncharged crime, but allowed

the People to introduce the evidence because it served to establish the elements of other crimes petitioner was charged with committing. (Tr. 303-04). Judge Daniels stated, "clearly in this case the People have to prove that the defendant possessed the card with the intent to benefit himself. The strongest evidence of his intent to benefit himself when he had the card is the fact that he recorded the number and used it twenty-nine times for his own benefit as opposed to the person who owns the card." (Tr. 303-04). Petitioner's counsel repeated her objection. (Tr. 305).

The judge gave the following limiting instruction to the jury on its use of the evidence relating to the phone card:

> I've allowed the People to offer testimony that Jennifer Baldwin's phone card number was used to make phone calls after the card was returned. Now, the reference to the making of these calls is no proof whatsoever that the defendant possessed the propensity or disposition to commit the crimes charged in this indictment or any other crime. It is not offered for such a purpose, and must not be considered by you for that purpose.
>
> Instead, I've allowed such testimony solely for the limited purpose of allowing the People to offer such evidence with regard to the defendant's intent to commit the crimes for which he is charged. I charge you that such evidence may be considered by you only for such limited purpose and none other. The fact that I allowed you to hear such evidence should not be considered by you that I have any opinion as to its value to prove that purpose. The sufficiency of such evidence to prove the purpose for which it is offered is solely a question for the jury.
>
> If you find it insufficient and of no value, disregard it, forget it. If you find it sufficient, probative of that purpose, you

> may give it such weight as you deem you
> believe it deserves. It will then be your
> duty to consider such evidence with all the
> other evidence in the case in deciding
> whether the People have proved the
> defendant's guilt beyond a reasonable doubt
> of the crime charged in the indictment.

(Tr. 441-43).

### D. **Uncharged "Prior Incidents" Testimony**

Petitioner's counsel also requested that the prosecution not be able to raise in its opening that the security camera in the basement of the 118th Street Columbia apartment building had been installed in response to a prior break-in. (Tr. 205-08). Counsel argued that eliciting testimony of a break-in weeks earlier was both irrelevant and prejudicial, particularly where this case already involved three basement burglaries. (Tr. 209-10). Judge Daniels overruled the objection. (Tr. 210-14).

Prior to the start of the second day of trial, petitioner's counsel reopened the issue of testimony of uncharged crimes, arguing that the only value of the evidence of a prior burglary in the Columbia University building was to improperly suggest that petitioner had somehow been involved. (Tr. 290-93). The court reiterated its view that the probative value was "very slight" but insisted that the prejudice was also "very slight." (Tr. 293-94). The court then ruled that the prosecutor could elicit that the security had been improved three weeks earlier but not that it was in response to a burglary. (Tr. 295, 301-02).

The following day, Sergeant Castellano testified.  The prosecutor and Castellano had the following exchange:

Q    You spoke with Dennis O'Sullivan?

A    Yes.

Q    What date was that?

A    That was on March 30th.

Q    Did you receive anything from Dennis O'Sullivan?

A    We received a videotape.

Q    And you viewed the tape?

A    Yes.

Q    Did Mr. O'Sullivan supply you with any information regarding the man on the tape?

A    He told me he had seen the man, and had known the man from previous incidents.

Q    Did you get the name of this man?

A    Yes.

MS. WEST [Petitioner's Counsel]: Objection, Judge.

THE COURT: I am sorry.  You object to whether he got a name, is that what you are saying?

MS. WEST: The prior question, Judge.

THE COURT: All right.  You have to be a little bit more timely with your objection.

MS. WEST: I should have been quicker, your Honor.

THE COURT: All right.  Again, don't go into the substance of the conversation that you had with anyone outside.

Q    You received the name from Dennis O'Sullivan?

```
A     Yes.

Q     And after getting the name, again, did
      you continue your investigation?

A     Yes.

Q     And from that name did it relate at all
      to the investigation regarding Ms.
      Baldwin?

A     Yes, it did.

Q     Okay.  How's that?

A     The name Tony came out, and while
      looking for a past arrest of Tony I came
      across --

MS. WEST: Objection, Judge.

THE COURT: Sustained.
```

(Tr. 447-48).

At the end of the People's case, the defense moved for a mistrial based on Castellano's testimony that Dennis O'Sullivan said he knew petitioner from "prior incidents," arguing that a mistrial was appropriate if one considered Castellano's testimony in light of the prosecutor's opening on the uncharged burglary. (Tr. 468-69).  Moreover, counsel claimed that a curative instruction would merely highlight the prejudicial testimony and would not now undo the harm.  (Tr. 469-70).

The court believed that there had been no testimony "whatsoever" that petitioner had committed a prior burglary and denied the mistrial motion.  (Tr. 473).  The court reiterated its offer of a curative instruction.  (Tr. 473).  Counsel refused the instruction.  (Tr. 473-74).  The court denied the mistrial motion.  (Tr. 473).

On December 16, 1998, the jury found petitioner guilty of one count of Burglary in the Second Degree, two counts of Criminal Possession of Stolen Property in the Fifth Degree, one count of Criminal Trespass in the Second Degree (a lesser included offense of one of the burglary charges), and one count of Criminal Possession of a Controlled Substance in the Seventh Degree. The jury acquitted petitioner on the remaining counts.

III. **The Appeals**

Petitioner raised two issues on appeal: (1) the trial court's denial of the requested three-hour adjournment deprived him of a fair trial; and (2) the admission of evidence relating to the MCI phone card as well as Castellano's testimony about "prior incidents" denied him a fair trial. (Ex. A). The appeal did not mention fingerprint evidence. (Id.).

On November 7, 2002, the Appellate Division unanimously affirmed. See People v. Jones, 753 N.Y.S.2d 361, 361 (1st Dep't 2002). The court held that: (1) the half hour continuance was proper because there had been ample time for defense counsel to confer with her client, and (2) there was no error in the admission of the uncharged-crimes evidence because it did not directly implicate petitioner and was not particularly prejudicial. Id.

On January 7, 2003, the Court of Appeals denied leave to appeal. See People v. Jones, 99 N.Y.2d 583 (2003). Petitioner's letter for leave to appeal focused on one claim raised in his first appeal, namely the trial court's refusal of

the request for a three-hour adjournment.  (Ex. E).  Petitioner's
letter only raised tangentially the issue of Castellano's "prior
incidents" testimony and neglected to raise at all the uncharged
crimes issue surrounding the MCI phone card.  (Ex. E at 3).

## IV.  **Prior Proceedings in this Court**

Petitioner filed the instant petition on May 9, 2003.
On August 28, 2003, respondent filed a brief in opposition
arguing, inter alia, that petitioner's ineffective assistance of
counsel claim was unexhausted.  By letter dated September 5,
2004, petitioner requested that the Court stay the petition with
respect to his exhausted claims and dismiss the petition, without
prejudice, with respect to his ineffective assistance claim, so
that he could exhaust his state court remedies.

On September 22, 2004, the Court granted the request
for a stay of the "mixed" habeas corpus petition, and dismissed
without prejudice the claim of ineffective assistance of counsel,
allowing petitioner thirty days to exhaust his state court
remedies.  The deadline was subsequently extended to November 22,
2004.  By letter dated December 22, 2004, petitioner advised the
Court that his state-court motion pursuant to New York Criminal
Procedure Law ("C.P.L.") § 440.10 had been scheduled for a
hearing on December 16, 2004.  Having heard nothing from
petitioner since that time, on October 26, 2005, the Court
ordered petitioner within thirty days to update the Court on his
efforts to exhaust and advise the Court as to which claims he
wished to pursue.  Via letter postmarked November 3, 2005,

petitioner responded by sending the Court a copy of the state court decision denying his § 440.10 motion. With no other guidance from petitioner, the Court assumes petitioner's final communication is indicative of his wish to reinstate the stayed claims from his first habeas petition and amend the stayed petition to include his ineffective assistance of counsel claim.

## DISCUSSION

At the outset, I note that it appears that three of petitioner's claims remain unexhausted. Generally, a federal court may consider a petition for habeas corpus only if the petitioner has exhausted all state judicial remedies, see 28 U.S.C. § 2254(b)(1), and he must have presented to the state courts "both the factual and legal premises of the claim he asserts in federal court." Harris v. Scully, 779 F.2d 875, 878 (2d Cir. 1985) (citation omitted).

Petitioner's § 440.10 motion focused on his trial counsel's failure to object to the release of a juror prior to the completion of voir dire. In the present petition, petitioner premises his ineffective assistance claim on trial counsel's negligence in not preparing him to testify prior to the close of the People's case. Because petitioner has not presented to the state courts the same factual and legal premises he asserts in federal court, his ineffective assistance claim remains unexhausted, and must therefore be denied. See Minor v. Henderson, 754 F. Supp. 1010, 1020 (S.D.N.Y. 1991).

-19-

As to the other claims, he never raised in any appeal his claim that the prosecution improperly withheld fingerprint evidence. Likewise, petitioner failed to raise his uncharged-crimes testimony claim in his letter application for leave to appeal to the New York Court of Appeals. These claims therefore also remain unexhausted.

Furthermore, because New York law allows the filing of only one application for leave to appeal, petitioner's claims are also procedurally defaulted. See N.Y.C.P.L.R. § 500.10(a); see also Laurie v. Wittner, 228 F.3d 113, 124 (2d Cir. 2000). Nevertheless, a district court is permitted to deny an unexhausted claim on the merits. See 28 U.S.C. § 2254(b)(2); see also Duncan v. Walker, 533 U.S. 167, 191 (2001). I therefore proceed to examine the merits of petitioner's claims.

I.  **Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "placed a restriction on the power of the federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000). AEDPA sets forth new standards of review that make it more difficult for a habeas petitioner to obtain federal relief from a state conviction. It provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to any judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits unless the adjudication of the claim:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceedings.

28 U.S.C. § 2254(d)(1), (2)

The statute has been interpreted to require a petitioner to show not only that clearly established federal law was erroneously or incorrectly applied, but that the application was unreasonable. See Williams, 529 U.S. at 411. As the Second Circuit has explained, "a state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent' and arrives at [the opposite result]." Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001) (quoting Williams, 529 U.S. at 405). The standards set forth by AEDPA apply to all habeas petitions filed after the statute's effective date of April 24, 1996. See Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir. 2001) (citation omitted).

AEDPA also specifies the applicable standard for federal review of state-court factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In habeas

proceedings, a "determination of a factual issue made by a state court shall be presumed correct."  28 U.S.C. § 2254(e)(1).  The petitioner has burden to rebut this presumption "by clear and convincing evidence."  Id.

## II.  **The Merits**

As noted, petitioner raises four arguments in his habeas petition.  I address each in turn.

### A.  **Ineffective Assistance of Counsel**

Petitioner's entire argument on ineffective assistance of counsel is contained in one sentence of his petition: "Counsel had eight months to confer with Petitioner on whether or not to testify prior to the start of trial, however Counsel requested a three hour adjournment to confer with and prepare petitioner."

#### 1.  **Applicable Law**

To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy the two-pronged test set forth in Strickland v. United States, 466 U.S. 668 (1984).  Specifically, a petitioner must show that (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) he was prejudiced by counsel's deficient performance.  See id. at 686-88.  To demonstrate prejudice, a petitioner must prove that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different.  See id. at

-22-

694.  To succeed, a petitioner must overcome a "strong
presumption that counsel's conduct falls within the wide range
of reasonable professional assistance." Id. at 689.  Judicial
scrutiny of counsel's performance and trial strategy must be
deferential, "evaluat[ing] the conduct from counsel's
perspective at the time." Id.; see also Bell v. Cone, 535 U.S.
685, 698 (2002).  "The court's central concern is not with
'grad[ing] counsel's performance,' but with discerning 'whether,
despite the strong presumption of reliability, the result of the
particular proceeding is unreliable because of a breakdown in
the adversarial process that our system counts on to produce
just results.'" United States v. Aguirre, 912 F.2d 555, 561 (2d
Cir. 1990) (internal citation omitted) (quoting Strickland, 466
U.S. at 696-97).

## 2.  **Application**

Petitioner's claim that he was denied effective
assistance of trial counsel because his attorney failed to
confer with and prepare him to testify at trial is rejected on
the merits.  Petitioner's claim is hopelessly vague, and
petitioner has failed to support his claim with evidence of
prejudice by his counsel's alleged failures.

Petitioner's contention appears to be based on the
fact that his counsel was assigned this case in April 1998,
eight months prior to the start of trial on December 10, 1998,
an echo of Judge Daniels' admonition at trial.  (Tr. 464-65).
Petitioner offers nothing beyond this bare assertion to support

-23-

his claim that counsel was ineffective. Petitioner does not set forth any additional facts regarding the extent of his communications with trial counsel, does not claim that he would have taken the stand, or what effect such testimony would have had upon the evidence presented to the jury.

Petitioner neither cites to the record nor explains how trial counsel's alleged lapses were prejudicial. This vague and unsubstantiated claim is insufficient to support habeas corpus relief. See, e.g., United States v. Vargas, 920 F.2d 167, 170 (2d Cir. 1990) (petitioner's affidavit making allegations in "conclusory fashion" failed to demonstrate that counsel's decision not to call witness was unreasonable), cert. denied, 502 U.S. 826 (1991); Rosario v. Bennett, No. 01 Civ. 7142, 2002 WL 31852827 at **9, 31-33 (S.D.N.Y. Dec. 20, 2002) (denying claim of ineffective counsel based on "fail[ure] to consult [petitioner] about the facts of the case or the conduct of the trial, fail[ure] to offer sound legal advice, and fail[ure] to prepare [petitioner] to testify" because claim was "far too vague"); Hartley v. Senkowski, No. CV-90-0395, 1992 WL 58766, at *2 (E.D.N.Y. Mar. 18, 1992) ("In light of this demanding [Strickland] standard, petitioner's vague and conclusory allegations that counsel did not prepare for trial or object to errors carry very little weight.").

Even were I to ignore the vague and conclusory nature of petitioner's claim, there is little in the trial record to support habeas relief in this case. Despite counsel's claims in

seeking the three-hour adjournment that she had been unable to confer with petitioner since the commencement of trial (Tr. 462-465), petitioner's counsel made a number of statements to the court indicating that she had been able to confer with and even prepare petitioner. For example, in a sidebar conference, petitioner's counsel represented to the court that she was able to estimate the length of petitioner's possible testimony and indicated that she had been able to consider and prepare for petitioner's testimony. (Tr. 427). Similarly, on the following day, petitioner's counsel clarified that her application for an adjournment to confer with petitioner was not because she had not had the opportunity to speak with her client, but only that she had not had what she considered to be sufficient time. (Tr. 467).

Further, Strickland admonishes against mechanical standards for ineffectiveness, as there is no set rule for the number of times counsel must meet with a defendant. See, e.g., United States ex rel. Testamark v. Vincent, 496 F.2d 641, 642-43 (2d Cir. 1974) (rejecting failure-to-consult claim where attorney conducted an initial interview, "another interview occurred on the eve of trial," and petitioner "was before the court with counsel on various calendar calls and was aware of all plea bargaining efforts"), cert. denied, 421 U.S. 951 (1975); United States ex rel. Bradley v. McMann, 423 F.2d 656, 657 (2d Cir. 1970) (rejecting ineffective counsel claim even though attorney "did not interview or consult with [defendant]

until the day trial was to begin"), cert. denied, 400 U.S. 994 (1971); Byas v. Keane, No. 97 Civ. 2789, 1999 WL 608787 at *5 (S.D.N.Y. Aug. 12, 1999) (held petitioner's meeting with counsel twice for five or ten minutes was sufficient since "[t]o require that counsel meet with petitioner a specific number of times would effectively establish a mechanical rule in defiance of Strickland"). Petitioner's claim cannot, therefore, rest on a bare allegation that his counsel did not consult with him sufficiently.

Rather, petitioner has the burden of proving that the alleged lack of communication with and preparation by counsel prejudiced his defense. Petitioner has failed to meet this burden. The record of the trial in this matter reveals that petitioner's trial counsel was active and effective in presenting a strong defense on petitioner's behalf. Counsel had a firm grasp of all relevant facts. Petitioner's counsel made numerous motions and objections, successfully preserving petitioner's right to a fair trial by preventing certain pieces of prejudicial evidence from being presented to the jury and persuading the judge to limit the prosecution in other respects. In addition, petitioner's counsel effectively cross-examined witnesses, pointing out deficiencies in the criminal investigation and attacking the strength of the People's case. Petitioner's counsel presented a cogent and concise opening statement, and counsel delivered a persuasive and firm summation. It must also be noted that petitioner was acquitted

on two counts of second-degree burglary, in no small part
because of his counsel's efforts.  As the Second Circuit found
in a similar case, "a review of the trial record reveals that
[petitioner's] counsel performed more than adequately . . . .
He demonstrated ample familiarity with the particulars of
[petitioner's] background, which shows that he had sufficient
preparation."  Billy-Eko v. United States, 8 F.3d 111, 118 (2d
Cir. 1993).

Finally, petitioner has failed to demonstrate that his
trial counsel's claimed failure to consult with and prepare him
to testify prejudiced his defense.  Petitioner fails to
establish what evidence his testimony would have provided or
whether additional consultation with him would have altered his
defense.  See United States v. Wilson, No. 00-1042, 2000 WL
778021 at *3 (2d Cir. June 15, 2000) ("[I]t is far from clear
that [petitioner's] affidavit, read in its totality, even
alleges that his trial counsel failed to adequately consult and
inform him about his right to testify and the progress of his
case.  Even assuming arguendo that appellant was not so advised,
he has made no showing that his failure to testify somehow
prejudiced his defense."); see also United States v. Patasnik,
89 F.3d 63, 68 (2d Cir. 1996) (rejecting defendant's ineffective
counsel claims based on, inter alia, alleged failure to prepare
and failure to listen to defendant's version of events, because
"in [counsel's] well-researched and articulate statement before
the district court, he raised numerous objections to the

presentencing report and demonstrated a thorough knowledge of [defendant's] background and the record"); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817, at *10 (E.D.N.Y. Sept. 25, 2001) ("[A]t trial petitioner was bound by the story he had given to the police in his oral, written and videotaped statements. Thus, even if he could demonstrate that his counsel failed to consult with him, [petitioner] could not establish that further consultation would have altered the defense in a manner that 'undermine[d] confidence in the outcome of the case.'") (quoting Strickland, 466 U.S. at 688); Farrington v. Senkowski, 19 F. Supp. 2d 176, 179 (S.D.N.Y. 1998) (Parker, D.J.) ("The fact that counsel is prepared and familiar with the relevant facts and legal principles is usually sufficient to defeat a claim that trial counsel was ineffective.") (citation omitted).

For these reasons, petitioner's claim of ineffective assistance of counsel is rejected.

**B.  Improper Exclusion of Fingerprint Evidence**

Petitioner argues that the court committed error when it improperly excluded "crucial physical evidence," violating his Eighth Amendment rights.  Specifically, petitioner argues that the results of fingerprint tests from the crime scene were never disclosed to him prior to trial, and the fact that there was no conclusive "match" would have exonerated him.  Although petitioner frames his claim as wrongful exclusion of evidence, it is more accurately addressed as a Fourteenth Amendment due process claim or a claim under Brady v. Maryland, 373 U.S. 83

(1963).  Treating the claim accordingly, and for the reasons set forth below, petitioner's claim is rejected as meritless.

### 1.  Applicable Law

In Brady v. Maryland, the Supreme Court held that a criminal defendant's due process rights encompass the obligation of the prosecution to produce evidence that is "material either to guilt or to punishment."  373 U.S. 83, 87 (1963).  Evidence is considered to be material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  Furthermore, the prosecution must fulfill this obligation even in the absence of a specific request from the defense.  Id. at 682 (endorsing Strickland test for materiality as applicable regardless of whether defense makes request).  Accordingly, the three essential elements of a Brady claim are "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the State must have suppressed that evidence, either willfully or inadvertently, and (3) prejudice must have ensued."  Eubanks v. United States, No. 97 Civ. 3891, 2005 WL 1949474, at *7 (S.D.N.Y. Aug. 11, 2005) (citing Banks v. Dretke, 540 U.S. 668, 691 (2004)).

### 2.  Application

Petitioner's contention that his due process rights were violated because the state wrongfully withheld evidence is

rejected on the merits because petitioner is unable to meet any of the requirements for a successful Brady claim.

Petitioner contends that he was denied access to fingerprint records recovered from the crime scene that would have exonerated him. The trial record, however, indicates that there was no "withholding" within the meaning of Brady. Without question, petitioner's counsel was provided the results of the fingerprint investigation in time for its use at trial, as counsel was able to establish on cross-examination of the investigating officer that fingerprint testing was done and no match was established. (Tr. 457-58). In addition, petitioner's counsel attacked the integrity of the criminal investigation in her summation, arguing that Castellano did an "embarrassing" job in testing for fingerprints. (Tr. 493). As the Second Circuit has held, a defendant is not entitled to have the prosecutor turn over all potentially exculpatory and impeaching material on demand. All that the Constitution requires is that the material be disclosed in time for its effective use at trial. See United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of [the] disclosure Brady and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.") (citation omitted). Because petitioner had sufficient opportunity to make use of the allegedly exculpatory information and is unable to show any prejudice resulting from his claimed

lack of access to such evidence, there has been no <u>Brady</u>
violation.

Moreover, even petitioner's claim that the fingerprint
evidence was favorable to his defense is dubious at best.  The
trial record reveals that the results were inconclusive.  (Tr.
383-84, 457-58).  There is therefore nothing in the record to
support petitioner's self-serving assessment that earlier
disclosure of the fingerprinting evidence would have "exonerated"
him.  Because petitioner is unable to demonstrate the exculpatory
nature of the inconclusive fingerprint records, the <u>Brady</u> claim
must be denied on the merits.  <u>See</u> <u>Tor v. Duncan</u>, No. 01 Civ.
3984, 2003 WL 22479250, at **3-4 (S.D.N.Y. Nov. 4, 2003)
(dismissing <u>Brady</u> claim that State failed to preserve bag with
potentially exculpatory fingerprint evidence on grounds that bag
was already tested for prints and none were found, and
defendant's suggestion that any recovered prints would be
exculpatory was purely speculative and without evidentiary
support); <u>United States v. Gary</u>, 341 F.3d 829, 834 (8th Cir.
2003) (dismissing <u>Brady</u> claim that State failed to produce
potentially exculpatory fingerprint card on grounds that card's
evidentiary value was highly speculative and would be material to
defense only "if the print was usable and if it matched someone
other than the Defendant"); <u>Taylor v. Maggio</u>, 581 F. Supp. 359,
366 (E.D. La.) ("In short, unusable or unreadable prints, which
might have been [the Defendant's, are] not exculpatory
material."), <u>aff'd</u>, 727 F.2d 341 (5th Cir. 1984).

Petitioner's claim is rejected on the merits.

### C.   **Trial Court's Refusal to Grant Adjournment**

Petitioner next maintains that the trial court's refusal to grant defense counsel's request for a three-hour adjournment to prepare petitioner to take the stand deprived petitioner of his right to a fair trial.  The Appellate Division denied petitioner's appeal on this point, finding the trial court's decision to be a proper exercise of its discretion that did not result in prejudice to petitioner.  <u>People v. Jones</u>, 299 A.D. 2d 162, 163 (1st Dep't 2002).

For the reasons set forth below, I find petitioner's claim is meritless.

### 1.   **Applicable Law**

It is, of course, well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense.  <u>See, e.g.</u>, <u>Taylor v. Illinois</u>, 484 U.S. 400, 409 (1988); <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 56 (1987).  In addition,

> [t]he right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution.  It is one of the rights that "are essential to due process of law in a fair adversary process."  The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony.

<u>Rock v. Arkansas</u>, 483 U.S. 44, 51 (1987) (citation omitted).

It is also a similarly well-established principle that the trial judge is afforded considerable discretion in matters of scheduling and in ensuring that the trial is conducted in a fair, efficient, and orderly manner. See, e.g., Taylor v. Illinois, 484 U.S. 400, 414-15 (1988). Further, the matter of an adjournment or continuance is traditionally within the discretion of the trial judge, and "it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). Consequently, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11 (1983) (quoting Ungar, 376 U.S. at 589).

In making this determination, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Grotto v. Herbert, 316 F.3d 198, 206 (2d Cir. 2003); see also Morris, 461 U.S. at 11 (denial of continuance did not violate defendant's Sixth Amendment right to counsel: "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for

compelling reasons.  Consequently, broad discretion must be
granted trial courts on matters of continuances.").

### 2. Application

In the present case, I cannot say that the trial
court's denial of the requested three-hour adjournment or the
Appellate Division's affirmance of this ruling constituted either
a deviation from or an unreasonable application of the above
principles.  Petitioner was not denied his right to present a
defense, nor has petitioner set forth sufficient facts to support
a finding that the lack of an adjournment resulted in a denial of
his right to testify on his own behalf.  As set forth more fully
above, this was not a case in which a defendant was prevented
from presenting evidence in his own defense.  As the denial of
petitioner's motion for an adjournment was within the trial
court's discretion, there was no violation or misapplication of
established federal law.  This claim is thus rejected.

### D. Improper Admission of Evidence

Finally, petitioner claims that the trial court
improperly permitted the prosecution to allow testimony regarding
"prior incidents" or uncharged crimes in violation of his
Fourteenth Amendment rights.  The Appellate Division denied
petitioner's appeal on this ground, finding that the "testimony
did not directly implicate the [petitioner] in any uncharged
crimes and was not particularly prejudicial."  Jones, 299 A.D.2d
at 163.  The Appellate Division also noted the fact that

petitioner's counsel declined the trial court's offer of a curative instruction. Id.

The Appellate Division's determination was neither contrary to, nor an unreasonable application of, clearly established federal law. This claim is therefore rejected.

### 1. **Applicable Law**

Where a petitioner merely challenges a state court's evidentiary rulings, this Court cannot consider the petitioner's claims. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); see also Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y. 1993) ("[R]ulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue."), report and recommendation adopted, 875 F. Supp. 182 (S.D.N.Y.), aff'd, 71 F.3d 406 (2d Cir. 1995). Even where a petitioner describes an evidentiary error as unduly prejudicial, it must be recognized that "not all erroneous admissions of [unfairly prejudicial] evidence are errors of constitutional dimension." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).

Indeed, to demonstrate that the admission of evidence by a state trial court constitutes a ground for federal habeas relief, a petitioner "must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional

magnitude." Copes v. Shriver, No. 97 Civ. 2284, 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997) (citation omitted). For an evidentiary error to rise to the level of a constitutional violation, the petitioner has to show that the alleged error was so prejudicial that it deprived him of a "fundamentally fair trial." Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) (citation omitted). For an "erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Dunnigan, 137 F.3d at 125 (citation omitted). In assessing materiality, the court must view the evidence "objectively in light of the entire record before the jury." Collins v. Scully, 755 F.2d 16, 19.

A decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under People v. Molineux, 168 N.Y. 264 (1901), constitutes an evidentiary ruling based in state law. See, e.g., Roldan v. Artuz, 78 F. Supp. 2d 260, 276-77 (S.D.N.Y. 2000) ("A habeas claim asserting a right to relief on Molineux grounds must rise to the level of constitutional violation . . . because Molineux is a state law issue.") (citations omitted). In general, evidence of uncharged crimes is inadmissible in a criminal trial due to the danger that the jury will convict based upon a perception that the defendant is predisposed to commit crime rather than based upon a determination of guilt of the charged offense. Id. at 277 (citing Molineux, 168 N.Y. at 291).

In Molineux, however, the New York Court of Appeals held that
evidence of other crimes or bad acts may be admitted to the
extent that it is relevant to an issue other than the defendant's
criminal tendency, such as motive, intent, or identity.
Molineux, 168 N.Y. at 293.  Accordingly, evidence of other crimes
properly introduced under this exception does not violate the
rights of the accused or provide a basis for habeas relief.
Marrero v. Senkowski, No. 01 Civ. 5867, 2003 WL 21750137, at *11
(S.D.N.Y. July 28, 2003) (habeas claim denied where evidence of
defendant's involvement in drug enterprise was used to establish
motive for killing); Edmonds v. McGinnis, 11 F. Supp. 2d 427, 433
(S.D.N.Y. 1998) (same).

### 2.  **Application**

As a threshold matter, the issue of whether an
admission of uncharged crimes can ever constitute a violation of
the Due Process Clause has not been decided by the Supreme Court.
See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("[W]e express
no opinion on whether a state law would violate the Due Process
Clause if it permitted the use of 'prior crimes' evidence to show
propensity to commit a charged crime.").  Given that the Supreme
Court has not held that the use of uncharged crimes would violate
the Due Process Clause, the Appellate Division's rejection of
this claim is hardly either contrary to or an unreasonable
application of clearly established Supreme Court law.
Consequently, I cannot find a due process violation because to do
so would amount to the creation of a new rule of constitutional

law, which a federal court is not permitted to do in a habeas corpus proceeding.  See Teague v. Lane, 489 U.S. 288, 316 (1989).

More importantly, however, there is nothing in the trial record to suggest that the evidence concerning the "prior incidents" denied petitioner due process of law.  Petitioner points only to Castellano's isolated reference to "prior incidents," coupled with the prosecution's comments during opening statements regarding an uncharged burglary and the pattern of basement burglaries in the Columbia University area.  (Tr. 227, 447).  Yet, Castellano testified only that Dennis O'Sullivan knew petitioner from "previous incidents," not previous burglaries or crimes (Tr. 447), and Judge Daniels expressly held the Dennis O'Sullivan could not testify as to any "prior burglary."  (Tr. 301-02).

Moreover, Judge Daniels instructed the jury that what was said in opening statements was not evidence (Tr. 216) and instructed jurors both prior to the start of trial and immediately prior to deliberations that if he sustained an objection, the testimony elicited was improper and was no longer evidence.  (Tr. 216-18, 538-39).  Further, Judge Daniels offered to give a curative instruction at the time the "prior incidents" testimony was introduced, but petitioner's counsel declined this remedy.  Regardless of the trial counsel's refusal of a curative instruction, this Court must assume that the jurors understood and followed the other limiting instructions issued by Judge Daniels.  See Zafiro v. United States, 506 U.S. 534, 540, (1993);

Roldan v. Artuz, 78 F. Supp. 2d 260, 281 (S.D.N.Y. 2000).

After receiving such instructions from Judge Daniels, the jury was able to reach a unanimous verdict, presumably having understood the limited purpose for which the evidence should be used. Even more, the jury acquitted petitioner on two counts of burglary in the second degree stemming from the March 30th and April 5th incidents. This verdict, by itself, serves as strong evidence that the "prior incidents" testimony did not prejudice petitioner.

Petitioner also contends that the trial court improperly permitted evidence that twenty-nine unauthorized calls had been made using Baldwin's MCI Calling Card number. I reject this argument for the same reasons. The trial court instructed the jury that the evidence of the unauthorized phone calls was not proof of petitioner's propensity or disposition to commit crimes and that they were not to be considered for that purpose. (Tr. 441-42, 563-64). In addition, the trial court expressly limited such testimony as to the issue of petitioner's intent to commit the crimes for which he is charged. (Tr. 442, 563-564). The Appellate Division affirmed. As explained above, this ruling on an issue of state law was not contrary to, or an unreasonable application of, clearly established federal law, and did not rise to the level of a federal constitutional violation. Indeed, the evidence of the calls was strong evidence that petitioner committed the burglary -- clearly he used the MCI phone card to call not only Baldwin but his friend, Joanna Marc, and the fact

that he used the card twenty-nine times was inconsistent with his story that he found Baldwin's wallet and was trying to help her by returning it.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because the petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be taken in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated:   New York, New York
         August 1, 2006

                                    DENNY CHIN
                                    United States District Judge